UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
WILLIAM QUINTANILLA *on behalf of himself,*
*FLSA Collective Plaintiffs and the Class Members,*

                               Plaintiff,                                  **REPORT AND**
                                                                        **RECOMMENDATION**
               -against-                                      19-CV-6894 (JMA) (ARL)

PETE'S ARBOR CARE SERVICES, INC. and
PETER FIORE *individually,*

                               Defendants.
-------------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

      The plaintiff, William Quintanilla ("Quintanilla"), commenced this putative collection action under the Fair Labor Standards Act ("FLSA") and the New York State Labor Law ("NYLL"), seeking to recover damages from the defendants, Pete's Arbor Care Services, Inc. ("Pete's Arbor Care") and Peter Fiore ("Fiore"), based on the defendants' alleged failure to pay wages and overtime as well as their alleged retaliatory conduct.  Before the Court, on referral from District Judge Azrack, are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, the Court respectfully recommends that both motions be denied.

## BACKGROUND

### A. Procedural History

      Quintanilla commenced this action on December 9, 2019.  ECF No. 1.  On January 30, 2020, the defendants sought leave to file a motion to dismiss the complaint, arguing, among other things, that the complaint lacked sufficient detail.  The defendants also argued that with respect to the plaintiff's claims under Rule 23 of the Federal Rules of Civil Procedure, the class was not adequately defined, the class definition required a determination of liability and the class

was too vague.  ECF No. 7.  However, at the premotion conference held on March 12, 2020, the case was referred to mediation.  Accordingly, the defendants never filed the motion to dismiss.

On July 1, 2020, the parties engaged in mediation but were unable to settle the matter. The parties then met with District Judge Azrack in early October and agreed to engage in further settlement discussions before her.  But, on October 28, 2020, after it became clear that settlement discussions were futile, District Judge Azrack set dates for the exchange of paper discovery, the taking of depositions and the submission of a joint pretrial order.  The defendants then filed their answer to the complaint.

Between October 2020 and May 2021, the parties filed numerous discovery applications, which were addressed by the Court.  In addition, the undersigned met with the parties on May 11, 2021, with the hopes of resolving all their discovery disputes.  ECF No. 33.  Despite that hope, the parties continued to disagree as to the scope of discovery to be conducted, requiring further judicial intervention.  However, the plaintiff never sought to certify the collective action. Instead, in September 2021, he sought leave to file a motion for summary judgment.

Although the plaintiff's request to file the summary judgment motion was granted, District Judge Azrack conducted one final settlement conference.  The Court also recommended that the parties continue to discuss settlement for a month and, if the case did not settle, to then abide by the briefing schedule set by the Court.  The case did not settle and, on February 25, 2022, the plaintiff filed his motion for summary judgment and his opposition to the defendants' cross motion for summary judgment.  Given the defendants' refusal to upload their opposition to the plaintiff's motion and cross motion for summary judgment, the plaintiff ultimately filed the defendants' papers for them and sought leave to file that motion under seal on the defendants' behalf.  Counsel for Quintanilla noted, however, that they did not believe that the defendants'

2


papers warranted a blanket sealing order. On July 15, 2022, those motions were referred to the undersigned.[1]

Following the referral, a lengthy conference was held with the parties to discuss the undersigned's intention to deny the motion for leave to seal. During that conference, counsel for the plaintiff indicated their client's willingness to withdraw the plaintiff's summary judgment motion and proceed to trial if the defendants were similarly willing to withdraw their cross motion. Accordingly, the undersigned scheduled a second telephone conference with the parties in order to give the defendants an opportunity to advise the Court if they were willing to withdraw the cross-motion for summary judgment. During the November 18, 2023 conference, the parties reported that they intended to go forward with summary judgment motion practice and the defendants also intended to file a renewed motion for leave to file under seal. In addition, given the confusion in the docket caused by the termination and reinstatement of the cross-motions, the parties agreed to refile the motions. Those re-filed motions are now before the Court.

### B.      Factual Background

The following facts are drawn from the parties' Local Rule 56.1(a) Statements. As is clear from the recitation below, many of the material facts are in dispute.

1.      Pete's Arbor Care

Pete's Arbor Care is a company that provides tree removal, tree pruning and land clearing services. Pl.'s Rule 56.1 Stmt. ¶ 2. Fiore is the sole owner of Pete's Arbor Care. *Id.* ¶ 1. Pete's

---

[1] The motions were initially referred in April 2022. However, due to a docketing error, the motions were terminated by the District Court in June 2022. Upon receipt of the termination order, the plaintiff sought, and was granted, reconsideration of the motion and the documents were re-referred on July 15, 2022.

Arbor Care does not provide services outside of New York and mostly works at customer properties in Suffolk County. Defs.' Add'l Stmt. [2]

According to the defendants, between 2013 and 2019, Pete's Arbor Care's "reported" annual revenue never exceeded $200,000. Defs' Add'l Stmt., Defs' Mem. at 6. The defendants also contend that between 2014 and 2019, Pete's Arbor Care's bank deposits ranged from $93,716 to $196,224. Defs' Mem. at 6. Fiore admits, however, that Pete's Arbor Care did not report all the cash payments it received on its tax returns. *Id.* He also testified that he deposited cash payments from clients in his personal bank account rather than his business account and used cash payments to pay employees. Rehman Reply Decl. Ex. 1 33:6-34:5.

2. Quintanilla's Schedule and Salary

Quintanilla was employed by the defendants from mid-2015 until his termination on October 15, 2019. Pl.'s Rule 56.1 Stmt. ¶ 3. On a normal workday, Fiore and all of the employees of Pete's Arbor Care would meet at the yard at approximately 6:30 a.m., prepare the trucks, grab breakfast at a local deli and then travel to a job together. *Id.* ¶¶ 4, 7. However, Quintanilla claims that there were days that he arrived at the yard by 5:00 or 5:30 a.m. *Id.* ¶ 5. The defendants dispute this fact and insist that Quintanilla never arrived at the yard that early. Defs.' Rue 56.1 CounterStmt. ¶ 5.

The parties do agree that employees frequently returned to the yard between 4:00 and 4:30 p.m. Pl.'s Rule 56.1 Stmt. ¶ 9. But Quintanilla claims that the average return time was,

---

[2] The Defendants' Additional Statements of Material Fact do not comply with Local Civil Rule 56.1. To begin with, the paragraphs are not numbered and often contain more than one statement making it difficult to verify the information with the citations to the extent such citations are provided. In addition, as Quintanilla correctly noted in his opposition, exhibit numbers are missing from several of the citations or involve a broad range of bates numbered discovery.

4

nonetheless, 5:30 p.m. *Id.* ¶ 11. In fact, he asserts that on his last day of work, he returned to the yard at 8:00 p.m. *Id.* ¶ 12. The defendants claim that their employees would rarely return to the yard as late as 6:30 p.m. Defs.' Rue 56.1 CounterStmt. ¶¶ 11, 12. In any case, when the defendants' employees returned to the yard, employees would still perform truck maintenance which included checking oil and anti-freeze, making sure the bolts or nuts of the wheels were not loose, maintaining tools and cleaning up the chainsaws. Pl.'s Rule 56.1 Stmt. ¶ 13.

Employees of the defendants who did they same job were paid in the same manner but tree climbers were paid more. *Id.* ¶ 14. Quintanilla was not a tree climber. *Id.* ¶ 15. He performed groundwork which included raking, operating a chainsaw, cleaning up, moving wood, blowing, performing maintenance and driving at times. *Id.* Quintanilla was also given extra tasks to perform outside of regular work hours like running errands to pick up oil or rakes. *Id.* ¶¶ 55-6. Quintanilla claims that he was not consistently compensated for the extra jobs. *Id.* ¶ 57. The defendants claim that they gave Quintanilla extra pay for those errands and extra pay because he had a Commercial Driver's License. Defs.' Rule 56.1 CounterStmt. ¶¶ 14, 56.

Although there were no written schedules for employees, from March through November, Quintanilla says that he generally worked Monday to Friday and occasional Saturdays for specific jobs. Pl.'s Rule 56.1 Stmt. ¶¶ 16, 53. From December to the end of February, work was slower but, during both periods, Quintanilla claims that employees seldom took a day off. *Id.* ¶ 54.

The parties agree that there were no set times for lunch or other breaks, but Fiore testified at his deposition that his employers were always given a half hour for lunch and a couple of 15-minute breaks during the day. Pervez Decl. Ex. B, 52:24-55:2. Quintanilla claims that his lunch

5

time breaks were interrupted, and he was not permitted to leave the job site. Pl.'s Rule 56.1 Stmt. ¶¶ 18, 19.

With respect to salary, the parties dispute whether Quintanilla and other employees were paid a flat rate each day or were paid an hourly rate based on the number of hours they worked. Pl.'s Rule 56.1 Stmt. ¶¶ 29-32, Defs.' Rule 56.1 CounterStmt ¶¶ 29-32. To this end, Quintanilla contends that, in 2015, he was paid $150 per day. Pl.'s Rule 56.1 Stmt. ¶ 22. The defendants dispute this fact and state that he was paid for eight hours at the regular rate of $15 per hour, plus two hours at the overtime rate of $22.50 per hour, plus another $15, "plus often extra." Defs.' Rule 56.1 CounterStmt. ¶ 22. Quintanilla claims that, in 2016, he was paid $200 per day. Pl.'s Rule 56.1 Stmt. ¶ 23. The defendants say that, in 2016, Quintanilla was paid for eight hours at the regular rate of $20 per hour, plus two hours at the overtime rate of $30 per hour, plus another $20," plus often extra." Defs.' Rule 56.1 CounterStmt. ¶ 23. Quintanilla further claims that, in 2017, he was paid $300 per day. Pl.'s Rule 56.1 Stmt. ¶ 24. By comparison, the defendants claim that, in 2017, Quintanilla was paid for eight hours at the regular rate of $25 per hour, plus two hours at the overtime rate of $37.50 per hour, plus another $25," plus often extra." Defs.' Rule 56.1 CounterStmt. ¶ 24.

Quintanilla asserts that, in September 2017, he then lost his driver's license, and the defendants reduced his salary to $250 per day. Pl.'s Rule 56.1 Stmt. ¶¶ 25, 26. The defendants assert that Quintanilla did not lose his license until sometime in 2018, at which point they reduced his hourly rate to $20 regular straight time and $30 overtime. Defs.' Rule 56.1 CounterStmt. ¶¶ 25, 26. Quintanilla states that at some point in 2018, his salary was increased, and he was again paid a flat rate of $300 up through the time of his termination. Pl.'s Rule 56.1

Stmt. ¶¶ 21, 27-8.  A workers compensation payroll summary supports Quintanilla's assertion that he was paid $300, as does a text message that appears to be from Fiore in which he states:

> You talking shit about me to Steve huh?
>
> I can just as easily go down to social services and let them know that you have been working [for] me and they will make you pay for all the benefits that you've had open til now and don't think for one minute that I won't do that if you continue with this pussy bullshit !!!!!'
>
> The only person you should be mad at is yourself for losing a $300 a day job because you can't keep your fucking mouth shut at work.

Pervez Decl. Ex. E.  Nonetheless, the defendants insist in their opposition that, in 2018, and at the time of his termination, Quintanilla was "paid for eight hours a day at the regular rate of $25 per hour, plus two hours at the overtime rate of $37.50 per hour, plus another $25, plus often extra beyond that, including an extra $50 per hour for every hour worked past 10." Defs.' Rule 56.1 CounterStmt. ¶¶ 21, 27-8.  Indeed, to prove that employees were paid an hourly rate, the defendants have offered the statements of two employees, one of whom says that Fiore is a good guy and pays him well.  *See* Granados Stmt.  The other employee, Darlin Sisney Bueso Bonilla, confirms that he was paid $20 per hour.  *See* Bonilla Stmt.

Related to their dispute over the way employees were paid, the parties specifically dispute whether Quintanilla and others were paid overtime and spread of hours pay.  Pl.'s Rule 56.1 Stmt. ¶¶ 33-34, Defs.' Rule 56.1 CounterStmt ¶¶ 33-34.  As noted above, the defendants claim that they always paid their employees overtime.  Quintanilla acknowledges that "at times" he received extra pay on days he and the crew were out late, but he suggests that the extra pay was discretionary.  Pl.'s Rule 56.1 Stmt. ¶ 35.  In fact, to highlight Fiore's failure to consistently pay proper wages, Quintanilla has submitted a copy of the following text exchange between Fiore and himself:

7

>Fiore:  Ho ho ho no overtime
>
>Quintanilla:  From 6:30 to 5:30 how many hours in total is that
>
>Fiore: Fuck you that's how many.

Pervez Decl. Ex. F.  Needless to say, the defendants dispute Quintanilla's characterization of the text.  Defs.' Rule 56.1 CounterStmt ¶ 35.

Finally, Quintanilla also claims that employees of the defendants did not have a regular pay day.  Pl.'s Rule 56.1 Stmt. ¶ 40.  Fiore claims he "endeavored to pay" his employees on Fridays and did so "most of the time."  Defs.' Rule 56.1 CounterStmt ¶ 40.

### 3. Quintanilla's Injury

On July 17, 2019, Quintanilla was injured on the job.  *See* Pl.'s Rule 56.1 Stmt. ¶ 37.  After Quintanilla filed a Worker's Compensation Claim, the defendants were asked to submit payroll records for the year preceding his injury.  *Id.*  It appears that Fiore did not maintain formal payroll records.  Accordingly, in order to construct the requested payroll record, Fiore worked from job cards, consulted weather applications, called customers and spoke to other employees.  *Id.* ¶ 38.  Based on the reconstructed records, the defendants reported that Quintanilla had earned $300 per day from July 2018 to July 2019.  *Id.* ¶ 39.

### 4. The Defendants' Bookkeeping Practices

Fiore has an accountant/bookkeeper who files the defendants' taxes, tracks expenses, and pays certain bills but does not pay payroll taxes on the payments made to employees or make deductions from the employees' pay.  *Id.* ¶ 41.  Fiore testified at his deposition that he did not report all his cash income to his accountant, nor did he advise him as to the cost of his payroll.  Pervez Decl. Ex. B, 65:7-66:24.  In addition, as noted above, Fiore admits that he did not reflect

all his cash payments on the defendants' tax returns. *Id.* ¶ 42. He also acknowledges that he would often use those cash payments to pay their employees. Pl.'s Rule 56.1 Stmt. ¶ 44.

As mentioned above, the defendants kept no employment records for their employees, nor did they maintain a system for employees to clock in or out. *Id.* ¶¶ 46, 48. Instead, Fiore wrote notes on his phone as to what he owed his employees and would delete them afterwards. *Id.* ¶ 47. As such, the defendants have no records reflecting the hours Quintanilla actually worked. *Id.* ¶ 48. Moreover, Quintanilla was never provided his hourly rate in writing, was never given a written wage notice and was never given any pay records or pay stubs. *Id.* ¶¶ 49-51.

5. Quintanilla's Termination

On or around October 15, 2019, Fiore fired Quintanilla. Defs.' Rule 56.1 CounterStmt ¶ 60. According to a police report filed by Quintanilla, Quintanilla and Fiore had a dispute over work conditions.[3] Pervez Decl. Ex. H. Quintanilla alleges he complained about his workplace injury, his late hours and never being paid overtime and then he was fired. Pl.'s Rule 56.1 Stmt. ¶ 66. The defendants acknowledge that late in his tenure Quintanilla "did a lot of complaining," but they contend that they fired him because he struck a co-worker, smoked marijuana in company trucks on company time and argued with Fiore within earshot of one of his valued customers. Defs.' Rule 56.1 CounterStmt ¶ 66.

Following the termination, Fiore sent Quintanilla a barrage of angry texts. Pl.'s Rule 56.1 Stmt. ¶ 59. In addition, Fiore sent Quintanilla another slew of angry text messages after he

---

[3] Quintanilla alleges he filed the report on the same day as his termination. Pl.'s Rule 56.1 Stmt. ¶ 60. Fiore claims the police report was filed two years later. Defs.' Rule 56.1 CounterStmt ¶ 60.

learned that Quintanilla had hired an attorney. *Id.* ¶ 61. Among other things, Fiore threatened to have Quintanilla deported. *Id.* ¶ 63. He also accused Quintanilla of welfare fraud and threatened to report him. *Id.* ¶ 64. Quintanilla filed a Human Rights Complaint on February 25, 2021, alleging discrimination, harassment, hostile work environment and retaliation. Defs.' Add'l Stmt.

## DISCUSSION

### A. Standard of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *Celotex,* 477 U.S. at 322). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

    **B.**    **Quintanilla's Motion**

Quintanilla seeks a determination, as a matter of law, that the defendants failed to properly compensate him in violation of the FLSA and NYLL. The FLSA requires employers to pay their employees the statutory minimum wage as well as a premium (one and one-half times the regular rate) for hours worked above 40 hours per week. 29 U.S.C. §§ 206, 207; *see Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.,* 723 F.3d 192, 200 (2d Cir. 2013) ("The FLSA mandates that an employee engaged in interstate commerce be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty per week. . .."). The NYLL mirrors the FLSA in most but not all respects. The NYLL also requires employers to pay a "spread-of-hours" premium equal to one hour of pay at the statutory minimum wage for each day an employee works over ten hours. NYLL § 650 et seq.; N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 12 §§ 142–2.2, 142–2.4.

"'To establish liability under the FLSA [and the NYLL] on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'" *Alvarado v. GC Dealer*

11

*Servs. Inc.,* 511 F. Supp. 3d 321, 364 (E.D.N.Y. 2021) (citing *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 361 (2d Cir. 2011). Even in instances where, as here, "a defendant fails to maintain proper and accurate employment records as required by the FLSA," an employee must still prove that he has in fact performed work for which he was improperly compensated by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Id.* (citing *Reich v. S. New England Telecomm. Corp.,* 121 F.3d 58, 66-67 (2d Cir. 1997) and *Gamero v. Koodo Sushi Corp.*, 752 F. App'x 33, 36-37 (2d Cir. Oct. 18, 2018) (summary order) ("Where a plaintiff alleges . . . overtime pay violations, and the employer does not have complete records, . . . the plaintiff bears the burden of proving that he performed work for which he was insufficiently compensated, and of producing sufficient, credible evidence showing the amount and extent of the uncompensated work as a matter of just and reasonable inference.")). However, the employee's burden in such instances is not high and it is possible for a plaintiff to meet this burden through estimates based on his own recollection. *See id*. The presumption of accuracy can then be rebutted by the defendant, but a dispute as to the precise amount of a plaintiff's uncompensated work is one of fact for trial. *Id.* (citing *Kuebel*, 643 F.3d at 364).

In this case, there are too many factual disputes regarding the manner in which Quintanilla was paid and whether his salary included overtime pay for the Court to conclude, as a matter of law, that the defendants failed to properly compensate him.[4] Given the absence of time and payroll records, and his own lack of documentary proof to show the work he performed,

---

[4] In his memorandum, Quintanilla primarily cites to paragraphs in his Rule 56.1 Statement of Facts that were disputed by the defendants.

12

Quintanilla was understandably forced to rely on his own recollection as to the amount and manner in which he was compensated. To this end, Quintanilla testified that he would generally work between 55 and 72 hours a week and was always paid a flat rate in cash. Pl.'s Mem. at 17. While his contentions certainly raise some red flags regarding the defendants' employment practices, Quintanilla, nonetheless, admits that the precise amount of his damages is uncertain. *See* Pl.'s Mem. at 10.

In opposition to the motion, the defendants rely on the testimony of Fiore, who, in contrast, insists that his employees were always paid straight time for the first eight hours, time and a half for the next two hours, and an extra $50 for each hour after that. Fiore Aff. ¶ 13. Fiore further asserts that his agreement with Quintanilla was that he work ten hours a day, which may explain why Quintanilla's salary often appeared flat (e.g., in 2018, eight hours at the regular rate of $25 per hour, plus two hours at the overtime rate of $37.50 per hour, plus another $25 equals $300, which is the flat rate Quintanilla claims he was being paid each day). Indeed, Quintanilla's assertion that he received a daily rate that correlated with the actual number of days he worked is not necessarily inconsistent with the defendants' claim that they calculated his pay based on an hourly rate. *See* Pl.'s Mem. at 14-15. In addition, the defendants have offered statements from two employees, at least one of whom confirms that he was regularly paid an hourly wage plus two hours of overtime. *See* Bonilla Stmt.

Similarly, fact questions exist as to how often Quintanilla worked over ten hours and whether he was compensated for the spread of hours premium. As noted above, the parties dispute if Quintanilla ever arrived at the yard by 5:00 or 5:30 a.m. as he claims, *see* Pl.'s Rule 56.1 Stmt. ¶ 5; Defs.' Rule 56.1 CounterStmt. ¶ 5, and whether he frequently returned after 4:30 p.m. Pl.'s Rule 56.1 Stmt. ¶¶ 9, 11-12; Defs.' Rue 56.1 CounterStmt. ¶¶ 11, 12. More

13

importantly, Quintanilla does not appear to dispute that employees were paid an additional $50 on days they worked in excess of ten hours. Pl.'s Rule 56.1 Stmt. ¶ 34. Nor does he dispute that employees received extra pay on days they were out later than usual. *Id.* ¶ 35. In addition, the witness statements submitted by the defendants suggest that employees were paid for extra work – although it is not clear if they were paid for extra jobs or extra hours. *See e.g.,* Granados Stmt. Finally, although Quintanilla complains that there was no set schedule for lunch, his testimony is not necessarily contrary to Fiore's assertion that he didn't tell his workers when to eat but they always received a lunch break. Pl.'s Rule 56.1 Stmt. ¶ 20; Defs.' Rue 56.1 CounterStmt. ¶ 20.

Given the number of facts that are in dispute concerning the way Quintanilla was paid, how much he was paid, as well as the fact that issues of credibility are involved, summary judgment is improper. Accordingly, the undersigned respectfully recommends that the plaintiff's motion be denied.

### C. The Defendants' Cross Motion

The defendants seek summary judgment on the issue of whether Pete's Arbor Care is subject to the FLSA through enterprise coverage. "An employer is subject to enterprise coverage if its 'annual gross volume of sales made or business done is not less than $500,000' and it 'has employees engaged in commerce or . . . [the] handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person.'" *Ethelberth v. Choice Sec. Co.,* 91 F. Supp. 3d 339, 355–56 (E.D.N.Y. 2015) (citing 29 U.S.C. § 203(s)(1)(A)). "So long as the employer achieves an annual gross business volume of $500,000 or more, 'all of the employer's employees are covered under [the FLSA] as long as at least some handle, sell, or otherwise work on goods or materials that have been moved in or produced for commerce.'" *Id.*

(citing *Jones v. E. Brooklyn Security Services Corp.,* No. 11–CV–1021, 2012 WL 3235784, at *4 (E.D.N.Y. Aug. 7, 2012).

In this case, Pete's Arbor Care contends that they did not have an annual gross business volume of $500,000 or more. In support of this argument, the defendants have submitted numerous income tax returns and bank statements, which they claim proves that the highest reported annual revenue for Pete's Arbor Care between 2013 and 2019 was $196,524.[5] Defs.' Mem. at 6. They also note that Pete's Arbor Care's bank deposits between 2014 and 2019 ranged from $93,716.11 to $196,224. Based on this evidence and the testimony of Fiore, the defendants insist that Pete's Arbor Care cannot be considered an employer under the FLSA. In contrast, Quintanilla argues that the Court cannot rely on the evidence offered by the defendants given Fiore's admission that Pete's Arbor Care did not report all the cash payments it received on its tax returns. Indeed, as previously mentioned, Fiore testified at his deposition that he did not report cash income to his accountant, deposited cash payments from clients in his personal bank account rather than his business account and used cash payments to pay employees. *See* Pervez Decl. Ex. B, 65:7-67:2; Rehman Decl. Ex. 1 33:6-34:5. As such, the Court agrees that there is a genuine issue of material fact as to whether Pete's Arbor Care earned enough revenue to meet the FLSA definition of enterprise. *See Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337, 350 (E.D.N.Y. 2014) (denying summary judgment where plaintiffs' evidence challenged the reliability of the restaurant's stated yearly income as set forth in the tax returns).[6]

---

[5] The defendants have requested that the annual revenues reported in the tax returns be kept under seal; however, the information was included in the defendants' publicly filed memorandum. Although the Court intends to grant, in part, the defendants' motion for leave to file under seal certain documents, the Court sees no reason to seal any portion of this report, and it will be filed on ECF without any sealing or redaction.

[6] Given the Court's determination that summary judgment is precluded on the issue of enterprise coverage, the undersigned need not address the defendants' supplemental jurisdiction argument. Nonetheless the Court takes this

The defendants also argue that summary judgment should be granted because there is no evidence that Quintanilla was a covered employee. As referenced above, a "plaintiff can invoke 'individual coverage' under the FLSA if he was 'engaged in the production of goods for commerce' or otherwise 'engaged in commerce.'" *Ethelberth,* 91 F. Supp. 3d at 354. To be "engaged in commerce," the employee must work "in the channels" of "interstate or foreign commerce," or "in activities so closely related to this commerce, as to be considered a part of it." *Id.* However, several courts have found this element satisfied where employees "merely handled supplies or equipment that originated out-of-state." *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011) (collecting cases); *see e.g., Locke v. St. Augustine's Episcopal Church,* 690 F.Supp.2d 77, 88 (E.D.N.Y. March 3, 2010) (custodian handling cleaning products may invoke enterprise coverage because cleaning supplies have moved interstate). In this case, the parties do not dispute that Quintanilla performed groundwork which included utilizing rakes, chainsaws and blowers – equipment which was likely to have originated out of state. Accordingly, there is no merit to the defendants' argument that Quintanilla was not covered by the FLSA.

---

opportunity to note that counsel for the defendants' practice of quoting multiple pages of court decisions in single citations without any attempt at editing has created an unwarranted burden on the Court. In fact, rather than take the time to draft a cogent argument with focused case quotations, counsel simply cut and pasted large portions of Court decisions and added underlines to those sentences he wished to highlight. Indeed, counsel did not even bother to remove formatting numbers created for the published opinions, citations to the pleadings and evidence in those opinions, references to party names or even, the Court's direction to the Clerk the Clerk of the Court to close the cases, all of which made the defendants' memorandum difficult to digest.

   Counsel for Quintanilla has voiced similar complaints about the quality of the defendants' submissions in their opposition to the cross-motion. Quintanilla complains, for example, that defendants' Exhibit C contains the entire discovery production, amounting to thousands of pages, most of which is not relied on in the papers. Counsel notes that the defendants' submission had simply created a voluminous record, which is a burden to both the plaintiff and the Court. The undersigned agrees.

Finally, the defendants seek to dismiss Quintanilla's retaliation claim because he has instituted a proceeding before the New York State Division of Human Rights ("NYSDHR"). Specifically, they argue that Quintanilla has alleged many of the same allegations in his Human Rights Complaint as he has in the complaint in this action. This argument also lacks merit. While the defendants are correct that New York's Human Rights Law contains an election-of-remedies provision that requires a plaintiff to choose between an administrative remedy and a judicial one, see N.Y. Exec. Law § 297(9), the conduct at issue in the two proceedings are sufficiently different. In his complaint filed with the NYSDHR, Quintanilla claims that he was harassed by the defendants after he filed a police report against the defendants on the day of his termination. Among other things, in the administrative proceeding, Quintanilla complains about comments made about his sexual orientation and immigration status. In this case, Quintanilla's retaliation claim is brought under both the FLSA and the NYLL and is focused on what he says was a retaliatory termination after he complained about his wages. Accordingly, the Court does not find the claim to be impermissibly duplicative. For all these reasons, the undersigned also recommends that the defendants' motion for summary judgment be denied.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served by the Court on the parties. Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days. Failure to file objections within this period waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc.*, No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to

the Magistrate's finding" by failing to timely object); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997).

Dated: Central Islip, New York
June 12, 2023

                                                                                                         _____/s/_____
                                                                                                      ARLENE R. LINDSAY
                                                                                                      United States Magistrate Judge